NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  | : |  |
| --- | --- | --- |
| UNITED STATES OF AMERICA, | : |  |
|  | : |  |
| Plaintiff, | : | Criminal No. 09-00722 (JAP) |
|  | : |  |
| v. | : | **OPINION** |
|  | : |  |
| YAN ZHU, | : |  |
|  | : |  |
| Defendant. | : |  |
|  | : |  |

PISANO, District Judge.

A jury trial was held in this criminal case from March 14, 2011, until March 31, 2011. On April 6, 2011, the jury returned a verdict of not-guilty on one count of conspiracy to steal trade secrets (count one of the superseding indictment), not-guilty on two counts of theft of trade secrets (counts two and three of the superseding indictment) and guilty on seven counts of wire fraud (counts four through ten of the superseding indictment). After the verdict was announced by the jury, the Court polled all of the jurors, each of whom stated that they agreed with the jury's verdict.

Presently before the Court is a motion by the Defendant to set aside the guilty verdict pursuant to Federal Rule of Criminal Procedure 29(c) and a motion to grant a new trial pursuant to Federal Rule of Criminal Procedure 33. The United States of America (the "Government")

opposes the motions.  Oral argument was held on June 16, 2011.[1]  For the reasons set forth

herein, the Defendant's motions are denied.[2]

## I.      FACTUAL BACKGROUND

The Defendant is a Chinese national with various educational degrees, including a Ph.D.

in environmental engineering from Columbia University.  In April of 2006, the Defendant was

hired to work as a senior engineer at enfoTech, Inc., a company that develops and supports

environmental software primarily for governmental entities ("enfoTech" or the "Company").

The Company arranged for the Defendant to receive an H-1 visa to work legally in the United

States.  In connection with his employment at enfoTech, the Defendant signed a confidentiality

agreement (the "Confidentiality Agreement"), which prohibited the unauthorized disclosure of

enfoTech's confidential business information.[3]   During his employment at enfoTech, the

Defendant reported directly to Tony Jeng ("Jeng"), a co-owner of the Company.

In August of 2006, the Defendant introduced Jeng to his cousin-in-law, Wanqi Tang

("Tang"), who had access to government officials in the Shaanxi Province in China.  Several

months later, Jeng and Tang signed a cooperation agreement with the goal of forming a joint

venture company to develop and market environmental software to Chinese governmental

entities.  In connection with the cooperation agreement, Tang formed a company in China called

---

[1]      During oral argument, the Court asked the Government and the Defendant to brief whether there was any reason to question the jury's verdict based on possible inconsistencies in their decision.  The Government submitted a brief on June 24, 2011, citing to *United States v. Powell*, 469 U.S. 57, 58 (1984), explaining that a perceived or actual inconsistency in a jury verdict is not a basis for post-trial relief.  The Defendant agreed that *United States v. Powell* is controlling on the issue and conceded that there was no basis for post-trial relief for possible inconsistencies in the jury's verdict.

[2]      The Government moved to strike certain submissions filed by the Defendant after the instant motion was fully briefed and argued.  Having considered and rejected the Defendant's objected-to arguments, the Court denies the Government's motion to strike as moot.

[3]      The parties submitted conflicting evidence concerning the date on which the Confidentiality Agreement was executed.  Based on the trial record, it was signed as early as May 1, 2006, and as late as May 8, 2007.

Green Innovation Technology ("Green Innovation"), which was to be the Chinese counterpart to enfoTech.

In July of 2007, the Company entered into a contract with the Shaanxi Province in China to develop a software program called eWastePro. This software program would allow the Shaanxi Province to track chemical companies that produce hazardous waste, monitor the permits that the government issues to these chemical companies and predict the amount of hazardous waste that could be generated by a particular chemical company. According to the terms of the contract, the Shaanxi Province was supposed to make an initial payment, which was 25% of the total contract price, ten days after the contract was executed. That payment was not made until November of 2007 and no further payments were received by enfoTech.

Tang asked enfoTech for 800,000 Yen in "special marketing expenses" in connection with the Shaanxi Province contract. The Company agreed to this request and allocated that amount to Tang out of the first payment made by the Shaanxi Province in November of 2007. Jeng testified that the 800,000 Yen was deposited into an account in China and that Tang withdrew the money from that account. Jeng testified that Tang had told him previously that "it's custom, normal practice" to pay bribes to government officials in China. Jeng testified that he told Tang that such bribes were illegal and that he should not and cannot do that. At trial, Jeng stated: "I want to make it very clear. EnfoTech would not participate in any illegal activity, any bribe. So any gift given out need to be reasonable and need to be customary." [Trial Record at 798].

In October of 2007, the Defendant, Jeng and other enfoTech employees traveled to China to demonstrate the eWastePro software program to the Shaanxi Province officials. The parties submitted conflicting evidence at trial as to the functionality of the eWastePro software program

at that time.  The Defendant contends that, during this demonstration, he misrepresented the product as being fully functional when, in fact, over half of the program was inoperable and made to appear operable by the use of dummy data.  [Trial Record at 1459-1461 and 1551].  The Defendant's expert witness testified that the permit and manifest modules were not operational. [Trial Record at 1459-1461].  The Government, on the other hand, presented evidence at trial showing that portions of the program were functional at the time of the demonstration.  Sara Liu ("Liu"), a former enfoTech employee who worked on the eWastePro program and attended the demonstration, testified that the survey module was functional at the time of the demonstration, but she admitted that it suffered from certain deficiencies, which she explained was typical for the software development process.  [Trial Record at 1180-1181].

The parties also presented conflicting evidence about how much work was done on eWastePro after enfoTech returned from the demonstration in China.  The Defendant testified that, following the demonstration to the Shaanxi Province officials, Jeng told him that the software was complete and no further work would be done until additional payments had been made by the Shaanxi Province.  [Trial Record at 1732].  The Defendant's expert testified that there was little change in the enfoTech product between October of 2007 and January of 2008. [Trial Record at 1554].  After the October 2007 demonstration, the Shaanxi Province officials asked enfoTech to enter data relating to approximately 400 companies in order to evaluate the practicality of the system.  [G. Ex. 109T and 110T].   There is no evidence that this work was completed.  The Government, on the other hand, presented evidence at trial showing that enfoTech continued to work on eWastePro after the demonstration in October of 2007.  Liu testified that enfoTech created a list of all outstanding issues with the software program and that she worked on fixing the bugs in the program after the demonstration.  [Trial Record at 1182-

1183].   Jeng testified that enfoTech devoted substantial resources to the development and completion of the software program.   [Trial Record 568-569].   The Defendant was copied on emails in January of 2008 that show that enfoTech came up with a plan to complete development of eWastePro for delivery in March of 2008.   [G. Ex. 166].   Jeng testified that he traveled to Shaanxi Province in January of 2008 to demonstrate portions of the program to government officials.   [Trial Record at 564-572].   During that trip, Jeng also arranged for the Shaanxi Province officials to sign a contract extension past its original expiration date of February 21, 2008, so that the Shaanxi Province could have additional time to get funding for the money it owed to enfoTech.   [Trial Record at 572].   According to Jeng, all the modules for the software were completed by March of 2008, and enfoTech only stopped work on the eWastePro program in April of 2008 because the Shaanxi officials would not accept delivery of the completed product.   [Trial Record at 573 and 580].

Towards the end of 2007 and beginning of 2008, the Defendant asked Liu and other enfoTech programmers about the functionality of the eWastePro program.   [Trial Record at 1740].   The Defendant claims that these programmers did not provide him with satisfactory responses, either telling him that the problem was an "easy fix" or indicating that if Jeng thought the program was complete, then it was complete.   [Trial Record at 1741].   The Defendant testified that he then reached out to Tang to help him evaluate the functionality of the eWastePro software.   [Trial Record at 1740-1741].   Tang subsequently introduced the Defendant to He Weiqi ("Weiqi"), who was a computer technician working for Green Innovation.   [Trial Record at 1741].

The Defendant emailed Weiqi enfoTech's deployment guide, design documents and source code on January 14, 2008, and January 28, 2008.   [G. Ex. 421, 425, 425AH].   He emailed

these documents to Weiqi from his personal email account.  That same month, the Defendant told Weiqi that it was not convenient for him to talk about those documents while he was at the enfoTech offices.  [G. Ex. 421T].   In March of 2008, the Defendant emailed Weiqi additional information relating to eWastePro, including design documents, waste profile design schema, logics and a preliminary functional requirement specification for the waste profile module, web page logics and form and user interface logics.  [G. Ex. 431, 225, 433, 433AH1, 433AH2, 226, 227].   That same month, after Weiqi had emailed Zhu at his enfoTech email address, the Defendant wrote "maybe I used that address by mistake yesterday," and "please help me keep an eye on that."  [G. Ex. 327T].

On April 20, 2008, Weiqi emailed a screen shot of the eWastePro log-in screen and home page to a graphic designer and asked him to "start your design work based on these."  [G. Ex. 337T and 337AH].  On April 30, 2008, Weiqi emailed the same graphic designer, attaching "the latest source material package and the images of captured interfaces that need to be modified." [G. Ex. 339T].  On May 11, 2008, the Defendant emailed Weiqi a document he had drafted entitled "Brief Introduction of Green Innovation Company's Pollution Source Information Management System."  [G. Ex. 342T and 342AH].   Several days later, Tang emailed the Defendant describing the recent expenses incurred by Green Innovation.  [G. Ex. 343T].  Later that same month, the Defendant told Weiqi that he was living at his "colleague's home temporarily and can't do business" because he didn't "want other people to see it."  [G. Ex. 343A-T].

On June 11, 2008, when Weiqi sent Green Innovation materials to the Defendant's enfoTech email address, the Defendant wrote, "Weiqi, this message was sent to my *enfoTech* mailbox. Be a bit more careful."  [G. Ex. 346T].  That same day, the Defendant sent Green

Innovation $9,000 via wire transfer.  [G. Ex. 710].   On July 1, 2008, the Defendant exchanged emails with Green Innovation about his ideas for designing the logo for the company.  [G. Ex. 233T].  On August 30, 2008, Tang sent an email to the Defendant, Weiqi and Mr. Dawi Zhang, which stated "Hello, my brothers.  Based on the current situation of our company, we need to hold a shareholder meeting as soon as possible."  [G. Ex. 355T].

Jeng became suspicious of the Defendant in and around April and May of 2008.  As a result, the Company began to monitor the Defendant's enfoTech email account.  Subsequently, Jeng became aware that the Defendant had sent various emails containing confidential business information to his personal email account.  [Trial Record 587-592; G. Ex. 230, 231, 232T].  In July of 2008, enfoTech terminated the Defendant for sending its proprietary information to persons outside the Company.  During the Defendant's exit interview, Jeng asked him whether he had sent enfoTech's confidential business information to anyone outside the company and he denied having done so.  The Defendant admitted during trial that he had lied to enfoTech about this.  The Company also asked the Defendant to bring his computer from home so that they could confirm that it did not contain any confidential business information.  The Defendant testified that, prior to bringing his computer to enfoTech for inspection, he formatted it so that everything was deleted.  The Defendant also admitted that he only brought one computer to enfoTech for inspection, even though he had more than one computer at home.

Meanwhile, Green Innovation had developed a environmental software program called eManage, which later appeared on the Shaanxi Province website.  The Defendant's expert witness testified that eManage contained many references to the terms "eWaste" and "ENBASE", which are terms that are unique to eWastePro.  [Trial Record at 1562-1563].  She explained that this may have been because enfoTech and Green Innovation were both "working on the same

project" for Shaanxi Province.  [Trial Record at 1568].  This expert further testified that, in her opinion, eWastePro and eManage were not the same program and, with the exception of the front end web page visual code, there were very few similarities between the programs.  [Trial Record at 1551].   She explained that, although the programs were not the same, they had similar functions, looked similar and there were similarities in "back-end code."  [Trial Record at 1594]. Green Innovation also developed an environmental software program to the Hebei Province in China.  The Defendant admitted to working on materials related to the Hebei Province for Green Innovation in March or April of 2008, while he was still working for enfoTech.  [Trial Record at 1839-1842].

On January 6, 2011, Yan Zhu (the "<u>Defendant</u>" or "<u>Zhu</u>") was charged in a ten count superseding indictment with conspiracy to steal trade secrets, theft of trade secrets and wire fraud.   On April 6, 2011, the jury returned a verdict of not-guilty on one count of conspiracy to steal trade secrets, not-guilty on two counts of theft of trade secrets and guilty on seven counts of wire fraud.  After the verdict was announced by the jury, the Court polled all of the jurors, each of whom stated that they agreed with the jury's verdict.

## II.    <u>LEGAL STANDARD AND DISCUSSION</u>

### A.    <u>Rule 29(c) Motion</u>

Pursuant to the Federal Rules of Criminal Procedure, if a jury returns a guilty verdict against a defendant, a Court "may set aside a guilty verdict and enter an acquittal." Fed.R.Crim.Pro. 29(c).  The Court applies "a 'particularly deferential' standard of review to a challenge to the sufficiency of evidence supporting a jury verdict." *United States v. Peppers,* 302 F.3d 120, 125 (3d Cir. 2002) (quoting *United States v. Dent*, 149 F.3d 180, 187 (3d Cir. 1998)).

In considering a motion for acquittal pursuant to Rule 29(c), the Court must "determine whether the evidence submitted at trial, 'when viewed in the light most favorable to the government, would allow a rational trier of fact to convict.' " *United States v. Hart*, 273 F.3d 363, 371 (3d Cir. 2001) (quoting *United States v. Helbling*, 209 F.3d 226, 238 (3d Cir. 2000)).  If "any rational juror could have found the challenged elements beyond a reasonable doubt, viewing the evidence in the manner that is most favorable to the government, neither reweighing [the] evidence, nor making an independent determination as to witnesses' credibility, [the Court must] sustain the [jury's] verdict."  *Peppers,* 302 F.3d at 125 (quotations omitted).  "It is 'immaterial' that the evidence may permit a 'less sinister conclusion' than the one the jury made. *United States v. Holmes*, 387 Fed.Appx. 242, 245 (3d Cir. 2010) (quoting *United States v. Smith,* 294 F.3d 473, 478 (3d Cir. 2002)).  All reasonable inferences must be made in favor of the prosecution.  *United States v. Ashfield*, 735 F.2d 101, 106 (3d Cir. 1984) (citing *Glasser v. United States*, 315 U.S. 60, 80 (1942)).  The burden to prove insufficiency of the evidence after a conviction lies with the defendant.  *United States v. Casper*, 956 F.2d 416, 421 (3d Cir. 1992). Indeed, "a finding of insufficiency of the evidence should 'be confined to cases where the prosecution's failure is clear.' "  *Smith*, 294 F.3d at 476 (quoting *United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1984)).

The federal wire fraud statute prohibits the use of electronic transmissions to execute "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."  18 U.S.C. § 1343.  "To prove . . . wire fraud, the evidence must establish beyond a reasonable doubt (1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of . . . interstate wire communications in furtherance of the scheme."  *United States v.*

*Hedaithy*, 392 F.3d 580, 590 (3d Cir. 2004) (internal quotation omitted).  In addition, the object of the scheme to defraud must be a "traditionally recognized property right." *Id*. (citing *United States v. Henry,* 29 F.3d 112, 115 (3d Cir. 1994)).

The Third Circuit has broadly defined a "scheme to defraud" as involving any effort at deceit which aims, in part, to deprive another of money or property.  *Hedaithy,* 392 F.3d at 590-91.  In evaluating whether there is a "scheme to defraud," the Third Circuit does not require that a scheme be "fraudulent on its face"; rather, it "must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* 140 F.3d 494, 528 (3d Cir. 1998) (quoting *Kehr Packages, Inc. v. Fidelcor,* 926 F.2d 1406, 1415 (3d Cir. 1991)). "[T]he words 'to defraud' . . . have the common understanding of wronging one in his property rights by dishonest methods or schemes, and usually signify the deprivation of something of value by trick, deceit, chicane or overreaching." *Carpenter v. United States,* 484 U.S. 19, 27 (1987) (internal quotation omitted).  A "scheme to defraud" may be carried out by deceitful statements, half-truths, concealment of material facts, fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension. *United States v. Bryant*, 556 F.Supp.2d 378, 431 (D.N.J. 2008) (quoting *United States v. Olatunji,* 872 F.2d 1161, 1167 (3d Cir. 1989) and *United States v. Stackpole,* 64 Fed.Appx. 842, 842 - 843 (3d Cir. 2003)).

In *Carpenter v. United States*, the Supreme Court found that the defendant, a newspaper columnist, had committed wire and mail fraud by misappropriating confidential business information from his employer, a newspaper.  484 U.S. at 28.  The defendant in that case co-wrote a regular column for the Wall Street Journal, which reported information about certain

stocks or groups of stocks and was known to affect the price of those stocks.   *Id*. at 22.   The defendant entered into a scheme in which he would leak the contents of that column to other conspirators in advance of its publication.   *Id*. at 23.   The other conspirators would then purchase or sell stocks based on the contents of the leaked column and its probable impact on the market. *Id*.   In discussing the contours of a "scheme to defraud", the Supreme Court explained that it is sufficient that an employer be deprived of its right to exclusive use of the confidential business information.   *Id*. at 26 – 27.   The Supreme Court further explained that the defendant in that case had engaged in a "scheme to defraud" by "appropriating [the newspaper's] confidential business information for his own use, all the while pretending to perform his duty of safeguarding it."   *Id*. at 28.   Viewing the evidence presented at trial in this case in the light most favorable to the Government, the Court finds that there is substantial evidence to support the Defendant's conviction of wire fraud under *Carpenter*.   The Defendant had access to enfoTech's confidential business information in the course of his employment with the Company.   During his employment with enfoTech, Zhu signed the Confidentiality Agreement which strictly prohibited the disclosure of proprietary information.   The evidence shows that he then emailed confidential business information to Green Innovation on an ongoing basis in violation of the Confidentiality Agreement.   The evidence further shows that the Defendant took steps to conceal and keep hidden his disclosure of enfoTech's proprietary information.

The Defendant attempts to distinguish *Carpenter* from the facts in this case.   For example, the Defendant points to language in the Confidentiality Agreement which authorized disclosure of proprietary information "as required in the performance of the Employee's duties to the Company."   The Defendant argues that he had reason to believe that his disclosure of enfoTech's proprietary information to Green Innovation was not a violation of the

Confidentiality Agreement.  However, emails written by Zhu and his own testimony at trial indicate that he knew he was not supposed to be sending the proprietary information outside of enfoTech.  Thus, a reasonable juror could have found that the Defendant knew he was not authorized to disclose the proprietary information and, instead, that he intentionally violated the Confidentiality Agreement.

The Defendant argues that his conviction must be set aside pursuant to Rule 29(c) because the Government did not produce evidence of a fraudulent misrepresentation or omission by Zhu.   In so arguing, the Defendant points out that the superseding indictment charged Zhu with a "scheme and artifice to defraud . . . by means of materially false and fraudulent pretenses, representations and promises . . ."   According to the Defendant, because the Government chose to rely on misrepresentations in the superseding indictment, it must prove them at trial. *Olatunji*, 872 F.2d at 1165; *United States v. Frankel*, 721 F.2d 917, 921 (3d Cir. 1983) (citing *United States v. Kram*, 247 F.2d 830, 832 – 833 (3d Cir. 1957).  However, viewing the evidence presented at trial in the light most favorable to the Government, the Court finds that a reasonable juror could have found that the Defendant made materially false and fraudulent pretenses, representations or promises.

The Third Circuit has held that "fraudulent representations . . . may be effected by deceitful statements of half-truths or the concealment of material facts . . . "  *Olatunji*, 872 F.2d at 1167 (quoting *United States v. Allen,* 554 F.2d 398, 410 (10th Cir. 1977)).  "We have stated that fraud convictions ... are valid where they are premised on 'a scheme or artifice to defraud ... involving some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension,' and that '[t]he scheme need not involve affirmative misrepresentation.' "  *Stackpole,* 64 Fed.Appx. at 842-43 (quoting *Kehr*

*Packages,* 926 F.2d at 1415) (quotations and citations omitted).  Viewed in the light most favorable to the Government, the evidence presented at trial shows that the Defendant engaged in a plan to send confidential business information to Green Innovation in violation of the promises he made in the Confidentiality Agreement.  The evidence shows that, instead of simply emailing the confidential business information to Green Innovation from his enfoTech email account, the Defendant sent the information from a separate, personal email account in order to conceal his actions from enfoTech.  The evidence further shows that the Defendant sent the confidential business information to Green Innovation knowing that he was not supposed to do so.  A reasonable juror could find that these broken promises and acts of concealment constituted false or fraudulent pretense, representations or promises.

The Defendant also argues that the intentional breach of the Confidentiality Agreement does not constitute a materially false promise.  Instead, the Defendant argues that a breach of the Confidentiality Agreement is more akin to a breach of an employee's implied promise not to steal from his employer, which does not amount to a misrepresentation for purposes of a fraud conviction.  *United States. v. Jones*, 471 F.3d 478, 481 – 482 (3d Cir. 2006).  The Court disagrees.  In *Jones*, the defendant was convicted of health care fraud for stealing money from the cash register from the methadone clinic where she worked.  471 F.3d at 479.  According to the government, the defendant's misrepresentation was that she had obtained the money from her employer through a broken promise to not steal.  *Id*. at 481.  The Court found that the government had not established, nor did it seek to establish, any type of misrepresentation by the defendant in connection with the delivery of, or payment for, health care benefits, items, or services.  *Id*.  The Court then found that "an implicit promise not to steal" from an employer does not amount to a misrepresentation for purposes of a fraud conviction.  *Id*. at 481 – 482.  In this

case, however, the Defendant made an actual promise not to disclose proprietary business information and then took significant steps to conceal his ongoing disclosure of that information.

In addition, the Defendant argues that his conduct does not constitute a materially false representation, pretense or promise because there was no connection between the falsehood and the deprivation of the property which is the object of the charged scheme.  In support, the Defendant points out that there is no evidence that his signing of the Confidentiality Agreement or any statement he made during the exit interview had any influence on any decision made by enfoTech.  However, the Supreme Court has explicitly stated that the Government is not required to show actual reliance on the part of the victim of a wire fraud scheme.  "[T]he fraud statutes did not incorporate *all* the elements of common-law fraud.  The common-law requirements of 'justifiable reliance' and 'damages', for example, plainly have no place in the federal fraud statutes."  *Neder v. United States*, 527 U.S. 1, 24-25 (1999) (citing *United States v. Stewart,* 872 F.2d 957, 960 (10th Cir. 1989) ("[Under the mail fraud statute,] the government does not have to prove actual reliance upon the defendant's misrepresentations"); *United States v. Rowe,* 56 F.2d 747, 749 (2d Cir. 1932) (L. Hand, J.) ("Civilly of course the [mail fraud statute] would fail without proof of damage, but that has no application to criminal liability")); see also *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 648 (2008) ("Using the mail to execute or attempt to execute a scheme to defraud is indictable as mail fraud . . . even if no one relied on any misrepresentation").

Finally, the Defendant argues that his wire fraud conviction must be set aside because there is no evidence of how he obtained any of the documents described in the wire fraud counts. However, the Government is not required to offer such evidence in support of a wire fraud prosecution.  " '[T]he use of the [wires] need not be an essential element of the scheme,' but

rather, '[i]t is sufficient for [the use of the wires] to be incident to an essential part of the scheme, or a step in the plot.' " *United States v. Keller*, 395 Fed.Appx. 912, 915 (3d Cir. 2010) (quoting *Schmuck v. United States,* 489 U.S. 705, 710–11, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989)).   In *Carpenter*, the interstate mailings and wirings associated with the publication of the newspaper to its customers served as the basis for the mail and wire fraud counts.  484 U.S. at 28.  The Supreme Court explained that this use of the interstate mails and wires satisfied the requirements of the mail and wire fraud statutes because the publication of that newspaper was in furtherance of the scheme to defraud, even if it did not result from the fraud itself.  *Id*.  Similarly, in this case, the Court finds that the Defendant's use of interstate wire communications to transmit the documents identified in the wire fraud counts properly serves as the basis for the wire fraud conviction because the transmission of those documents by the Defendant to Green Innovation was in furtherance of the scheme to defraud, regardless of how the Defendant acquired them.

### B.     Rule 33 Motion

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed.R.Crim.Pro. 33.   The Court may order a new trial "only if it 'believes that there is a serious danger that a miscarriage of justice has occurred – that is, that an innocent person has been convicted.' "  *United States v. Brennan*, 326 F.3d 176, 189 (3d Cir. 2003) (quoting *United States v. Santos,* 20 F.3d 280, 285 (7th Cir. 1994)).   In considering a motion for a new trial pursuant to Rule 33, the Court "exercises its own judgment in assessing the Government's case."  *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002).  These motions "are not favored and should be 'granted sparingly and only in exceptional cases.' "  *United States v. Silveus*, 542 F.3d 993, 1005 (3d Cir. 2008) (quoting *Gov't of Virgin Islands v. Derricks,* 810 F.2d 50, 55 (3d Cir. 1987)).

1.  <u>Whether the Defendant is Entitled to a New Trial Because the Weight of the Evidence Does Not Support an Intent to Defraud</u>

The Defendant argues that the conviction is against the weight of the evidence because it does not support a finding of intent to defraud.  The Defendant points to various facts and scenarios which might weigh towards a finding that Zhu did not have the requisite intent to defraud enfoTech.  The Defendant claims that, in sending enfoTech's confidential business information to Green Innovation, he intended to investigate whether the eWastePro program was functional, not – as the Government contends – in furtherance of a scheme to defraud the Company.  In support, the Defendant argues that he was afraid that he would be subject to criminal liability under Chinese law for misrepresentations made about the functionality of the eWastePro program at the 2007 demonstration.[4]  The Defendant claims he believed that the only way for him to avoid criminal liability under Chinese law was for enfoTech to deliver a functioning product to the Shaanxi Province officials.  The Defendant argues that it was reasonable for him to conclude that enfoTech would not deliver a functioning product to the Shaanxi Province because he believed that enfoTech wanted to cancel the contract.  The Defendant has suggested several theories as to why enfoTech might have wanted to abandon the contract, including because (1) they no longer wanted to pay the "special marketing expenses" associated with project, (2) they experienced difficulty in getting payments into the United States because of the strict controls China imposes on foreign currency and (3) the Shaanxi Province did not fulfill their payment obligations according to schedule.  Indeed, the evidence at trial

---

[4]      The Government presented evidence to support the conclusion that the eWastePro program was at least partially functional at the 2007 demonstration.  For example, Liu testified that the waste survey module of the software program was fully functional at that time.  [Trial Record at 1180-1181].

showed that each of these problems existed.  [E.g., Trial Record at 533, 550, 855].  However, the Defendant did not present any evidence directly supporting his claim that enfoTech wished to cancel the contract for these reasons.  While the evidence shows that enfoTech experienced certain difficulties in implementing the Shaanxi Province contract, the Court finds that the mere existence of these problems did not made it reasonable for the Defendant to believe that enfoTech planned to abandon the contract.

The Defendant also argues that it was reasonable for him to conclude that enfoTech would not deliver a functioning product to the Shaanxi Province because he believed that enfoTech had suspended work on the eWastePro program after the demonstration.  However, the Government has presented substantial evidence showing that enfoTech did not suspend work on the program after the demonstration.  For example, Liu testified that enfoTech continued to work on the program after the demonstration.  [Trial Record at 1182-1183].  Jeng testified that enfoTech devoted substantial resources to the development and completion of the eWastePro program and that all the modules were completed by March of 2008.  [Trial Record 568-569].  The Defendant was copied on emails showing that enfoTech came up plans to finish development of eWastePro for delivery in March of 2008.  [G. Ex. 166].  Jeng testified that he traveled to Shaanxi Province in January of 2008 to demonstrate portions of the program to government officials.  [Trial Record at 564-572].  During that trip, Jeng also arranged for the Shaanxi Province officials to sign a contract extension past its original expiration date of February 21, 2008, so that the Shaanxi Province could have additional time to get funding for the money it owed to enfoTech.  [Trial Record at 572].

The Defendant also claims that the substance of his disclosures to Green Innovation is inconsistent with an intent to defraud.  The Defendant argues that his failure to send the source

code for the library files is inconsistent with the intent to steal.  He explains that, without the source code for the library files, the enfoTech program could not be modified.  [Trial Record at 1552].  According to the Defendant, if Zhu wanted to steal the eWastePro program, he would have wanted to make the modifications necessary to complete the program and then get it into the market ahead of enfoTech's product.  However, the failure to send the source code for the library files does not significantly negate an intent to defraud.  The fact that the Defendant did not misappropriate the entirety of the eWastePro software program does not mean that he did not intend to use enfoTech's confidential business information to aid in the development of Green Innovation's competing product.

The Defendant also argues that the steps he took to conceal his actions from enfoTech were based out of a concern about Jeng and, therefore, should not be seen as evidence of intent to defraud.  The Defendant claims that Jeng made it clear that work on the project was not permitted, so he did not want him to know that he was continuing to do work on the project.  However, as discussed in detail above, the evidence presented at trial shows that enfoTech employees, including Jeng, continued to work on the project during the first quarter of 2008.  The Defendant also claims that he believed that he was permitted to share enfoTech's confidential business information pursuant to the Confidentiality Agreement, which authorized disclosures "as required in the performance of the employee's duties to the company."  The Court finds that the Defendant's significant efforts at concealing his actions and his testimony at trial show that he knew he was not authorized to disclose the information.

Finally, the Defendant argues that, if Zhu had misappropriated enfoTech's confidential business information for the purposes of setting up a competing business in China, he would have been the recipient of a $9,000 payment, not the payor.  The Defendant claims that this

payment was intended to help Green Innovation pay for overhead costs so that they could complete the software program so that he could avoid criminal liability for the demonstration in 2007.  The Government, on the other hand, contends that this was a capital contribution to Green Innovation.  The evidence of Zhu's continued role in Green Innovation, including emails relating to the choice of the logo for the company and requests for his attendance at shareholder meetings, supports the Government's claim that the Defendant made a capital contribution to Green Innovation.

Considering the evidence presented at trial as a whole, the weight of the evidence supports a finding that the Defendant intended to defraud enfoTech.  Although the Defendant's version of the evidence could be plausible, the jury found the Defendant guilty and the Court finds that there was sufficient evidence presented at trial to support that verdict.

2.  Whether the Defendant is Entitled to a New Trial Based on Newly Discovered Evidence

The Defendant also argues that he is entitled to a new trial under Rule 33 based on newly discovered evidence that suggests that Jeng committed perjury at trial.  The Defendant claims that he has recently developed evidence showing that Jeng created a spreadsheet in October of 2006 which shows four projections of anticipated costs for potential projects.  Three of those projections include a kickback payment of 800,000 Yen.  This evidence indicates that Jeng calculated the cost of kickbacks prior entering into the contract with the Shaanxi Province and strongly suggests that the 800,000 Yen of "special marketing expense" allocated to Tang was for kickbacks to government officials in China.  The Defendant argues that this evidence indicates that Jeng perjured himself at trial on a central issue for the defense that enfoTech abandoned the Shaanxi Province contract because they no longer wanted to pay kickbacks.

"There are five requirements that must be met before a court may grant a new trial on the basis of newly discovered evidence: (a) the evidence must be in fact newly discovered, i.e. discovered since trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal." *United States v. Quiles*, 618 F.3d 383, 388-389 (3d Cir. 2010) (quoting *United States v. Saada*, 212 F.3d 210, 216 (3d Cir.2000)).  Thus, "[a]s a general rule, a new trial will not be granted under Rule 33 where the new evidence is merely cumulative or impeaching."  *United States v. Mensah*, 2011WL 2550381 at *2 (3d Cir. 2001) (citing *Saada*, 212 F.3d at 216).  To determine whether newly discovered evidence warrants a new trial or is "merely" impeaching evidence, the Court must examine (1) whether there is a strong exculpatory connection between the newly discovered evidence and the evidence presented at trial or (2) whether the newly discovered evidence, though not in itself exculpatory, throws severe doubt on the truthfulness of critical inculpatory evidence that had been introduced at trial.  *Quiles*, 618 F.3d at 393.  "Determining the strength and importance of the exculpatory connection or the significance of the newly discovered evidence with respect to the credibility of critical evidence given at the trial is a difficult task that is left in the first instance to the discretion of the district court."  *Id*.

The Court finds that the newly discovered evidence does not warrant a new trial under Rule 33.  The Defendant has argued that, in sending the Company's confidential business information to Green Innovation, his intent was to evaluate the functionality of eWastePro and, if necessary, complete the program on behalf of enfoTech so that he could avoid criminal liability in China.  The Defendant argues that it was reasonable for him to believe that enfoTech was not

going to fulfill its contract with the Shaanxi Province.  One of the reasons that the Defendant claims it was reasonable for him to believe this is because enfoTech no longer wanted to pay the "special marketing expenses" required to do business in China.[5]  The newly discovered evidence shows that Jeng calculated the cost of kickbacks prior to entering into the Shaanxi Province contract and strongly suggests that he allocated 800,000 Yen to pay kickbacks in connection with that contract.  As an initial matter, it is clear that the newly discovered evidence does not throw "severe doubt on the truthfulness of critical inculpatory evidence that had been introduced at trial." *Id*.  There was never any inculpatory evidence presented on this issue.  In addition, the newly discovered evidence is only exculpatory in the sense that it strongly suggests that the 800,000 Yen in "special marketing expenses" was allocated to Tang for the payment of kickbacks to government officials in China.  However, there is still no evidence to show that enfoTech was going to abandon the contract because Jeng no longer wanted to pay that cost.  The Defendant argues that Jeng "refused to allow anymore special expenses."  However, the only evidence presented at trial relating to enfoTech's concerns about expenses were two sets of meeting minutes, which indicated that all future expenses would need to be discussed and approved by enfoTech.  These meetings occurred in March and May of 2008, after the Defendant had already emailed enfoTech's confidential business information to Green Innovation.  [G. Ex. 39T and 68T].  There is no exculpatory connection between the newly discovered evidence and the evidence presented at trial as there remains a total lack of support for the suggestion that the Defendant was reasonable in believing that enfoTech was not going to fulfill its contract with the Shaanxi Province because enfoTech no longer wanted to pay kickbacks to the Shaanxi Province officials.

---

[5]     The Defendant has also argued that enfoTech wanted to abandon the Shaanxi Province contract because (1) they experienced difficulty in getting payments into the United States because of strict controls China imposes on foreign currency and (2) the Shaanxi Province did not fulfill their payment obligations according to schedule.

Even if the newly discovered evidence does have an exculpatory connection to the evidence presented at trial, the Defendant's motion fails because it would not produce an acquittal during a new trial.  "When evaluating whether the evidence is likely to produce an acquittal, the court considers the new evidence in light of all the evidence presented at trial." *Mensah*, 2011 WL 2550381 at *3 (citing *United States v. Kelly*, 539 F.3d 172, 189 (3d Cir. 2008)).  Where there is sufficient independent evidence to sustain a finding of guilt, the Court will deny a motion for a new trial based on a piece of tainted evidence.  *Saada*, 212 F.3d at 217 n.6.  In this case, the Government presented substantial evidence that the Defendant had an intent to defraud enfoTech.  The Government showed that the Defendant emailed confidential business information to Green Innovation without authorization, that he was involved in Green Innovation's internal business on an ongoing basis and that Green Innovation eventually developed a competing software product called eManage.  The Government also presented substantial evidence showing that the Defendant's alternative explanation for his conduct was not reasonable.  The Defendant claims that he sent enfoTech's confidential business information to Green Innovation because he became concerned that the Company was abandoning the Shaanxi Province contract.  However, the Government showed that enfoTech continued to work on eWastePro during the relevant time period.  Liu testified that enfoTech continued to work on the program after the demonstration.  [Trial Record at 1182 and 1188-1189].  The Defendant was copied on emails that show that enfoTech came up with a strategy for completing the software program by the end of March of 2008.  [G. Ex. 166].  Jeng traveled to Shaanxi Province in January of 2008 to demonstrate portions of the program to government officials and arranged for Shaanxi Province extend the contract past its original expiration date of February 21, 2008. [Trial Record at 564-568, 572].  Based on the above, the Court finds that there is sufficient independent

evidence to sustain a finding of an intent to defraud, even assuming that there was some exculpatory connection between the newly discovered evidence and the evidence presented at trial.

**C.     Jury Instruction**

The Defendant argues that the Court erred by not specifically instructing the jury that it had to find the materiality of the statements beyond a reasonable doubt.  Because the Defendant failed to object to the jury instructions prior to the jury's deliberation, the court's review of the instructions is limited to plain error.[6]  *United States v. Cotton,* 535 U.S. 625, 631 (2002); *United States v. Gordon,* 290 F.3d 539, 543-45 (3d Cir. 2002).  Plain errors are those that "undermine the fundamental fairness of the trial and contribute to a miscarriage of justice."  *United States v. Young,* 470 U.S. 1, 16 (1985).  Under the plain error doctrine, "before an appellate court can correct an error not raised at trial, there must be (1) an error, (2) that is plain and (3) that affect[s] substantial rights."  *Johnson v. United States,* 520 U.S. 461, 466-467 (1997) (internal quotations and citations omitted).  This standard is satisfied where the error is so blatant as to have affected the defendant's substantial rights.  *Young*, 470 U.S. at 16.  Courts should refrain from viewing the challenged instruction in a vacuum, but instead should consider the challenged instruction in light of the complete trial record and the instructions as a whole.  *Id.* at 16-17.

Reviewing the jury instructions with these principles in mind, the Court finds that the failure to instruct the jury on materiality in the manner in which the Defendant now requests was not plain error.  In general, a false statement is material if it has "a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed."  *Neder v. United States,* 527 U.S. 1, 16 (1999) (quoting *United States v. Gaudin,* 515

---

[6]     Objections to jury instructions must be brought to the court's attention prior to the jury's deliberation. Fed.R.Crim.P. 30(d).  Failure to object in accordance with Rule 30(d) precludes appellate review, except upon a showing of plain error.  *Id.*

U.S. 506, 509 (1995)).  The Third Circuit has stated that the scheme must involve "fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension."  *United States v. Pearlstein*, 576 F.2d 531, 535 (3d Cir 1978) (citation omitted).  The jury instructions in this case stated that "the Government must prove each and every element of the offenses charged beyond a reasonable doubt."  [Jury Instructions at 21]. The jury instructions then explained that a "scheme to defraud is any plan, device or course of action to deprive another of money or property by means of false or fraudulent pretenses, representations or promises <u>reasonably calculated to deceive persons of average prudence</u>." [Jury Instructions at 48 (emphasis added)].   The Court finds that these instructions to the jury, read as a whole, make it clear that the Government was required to prove materiality of the false or fraudulent pretenses, representations or promises.

III.  **CONCLUSION**

       For the reasons above, the Defendant's motion to set aside the guilty verdict pursuant to Rule 29(c) and motion to grant a new trial pursuant to Rule 33 are denied.  An appropriate Order accompanies this Opinion.


                                        /s/ JOEL A. PISANO
                                        United States District Judge


Dated:  August 4, 2011